[Civ. No. 514.   Third Appellate District.—November 25, 1908.]

## J. M. BRALY, Respondent, v. FRESNO CITY RAILWAY COMPANY, Appellant.

NEGLIGENCE—WRONGFUL ASSAULT UPON PASSENGER—FALL FROM MOVING STREET-CAR—SUPPORT OF VERDICT FOR PLAINTIFF.—In an action against a street railway company to recover for injuries sustained through its negligence from the wrongful act of the conductor of one of its cars, in assaulting the plaintiff and causing his fall from one of its cars while in motion for nonpayment of fare, to plaintiff's serious and permanent injury, *held*, that the verdict for the plaintiff was sufficiently supported by his testimony, notwithstanding conflicting evidence to the contrary.

ID.—PROBABILITY OF PLAINTIFF'S TESTIMONY—MATTER FOR JURY.—The probability of plaintiff's testimony as to the manner of the injury was matter for the jury, there being nothing inherently unbelieveable in his testimony.

ID.—NONPAYMENT OF FARE DEMANDED—RIGHTS OF CONDUCTOR—RELATION OF CARRIER AND PASSENGER.—Notwithstanding the plaintiff had refused to pay the fare demanded, giving certain reasons therefor, and though the conductor, upon the facts, had the right to eject him in a reasonable manner for nonpayment of fare, he had no right to assault him and to cause his fall from the moving car. The relation of carrier and passenger still subsisted between the carrier and plaintiff, so far as the nature of the treatment due him from the defendant and his agents was concerned.

ID.—LIABILITY OF DEFENDANT.—If the conductor caught hold of the plaintiff in the manner testified to by plaintiff, and continued thus to hold him until the plaintiff fell or was thrown to the ground from the moving car, the act of the conductor involved an assault for which the defendant could be held liable for the resulting injury to the plaintiff.

ID.—RIGHT OF DEFENSE AGAINST ASSAULT.—If the trouble originated and occurred as described by plaintiff, he was justified in defending himself against the assault of the conductor.

ID.—CONTRIBUTORY NEGLIGENCE OF PLAINTIFF—QUESTION FOR JURY.—Where there is nothing in the plaintiff's testimony from which the jury would necessarily have been justified in finding that he was guilty of contributory negligence, that question is one peculiarly for the jury to determine.

ID.—FAILURE OF PLAINTIFF TO EXERCISE BEST JUDGMENT.—Even if it subsequently appeared that plaintiff did not exercise the best judgment in the manner of resisting the conductor's assault, yet that fact

cannot constitute negligence on his part. If he became perturbed and confused by the improper treatment received, the responsibility for any want of discretion on his part must fall upon defendant by whose negligence it was caused.

ID.—REFUSAL OF REQUESTED INSTRUCTIONS.—The court properly refused instructions requested by the defendant when substantially included in the charge of the court, which fully and fairly stated the law of the case to the jury. The court also properly refused requested instructions containing statements not authorized by the evidence.

APPEAL from a judgment of the Superior Court of Fresno County, and from an order denying a new trial. Geo. E. Church, Judge.

The facts are stated in the opinion of the court.

Everts & Ewing, Frank H. Short, and F. E. Cook, for Appellant.

L. L. Cory, and M. K. Harris, for Respondent.

HART, J.—Action for personal injuries.

The cause was tried by jury and verdict for $5,000 returned in favor of the plaintiff.

Judgment was thereupon entered in favor of the plaintiff for the damages so assessed by the jury.

The appeal is from the judgment and the order denying defendant a new trial.

The injuries complained of and for which damages were awarded were received by the plaintiff as the result of a fall from appellant's car in the city of Fresno, said fall having been caused, it is alleged, through the culpable negligence of the defendant, committed through its agent.

The appellant owns and operates a street railway system in the city of Fresno. One of its lines runs from the passenger depot of the Southern Pacific Company, in said city, over and along J street to the conjunction of J and Stanislaus streets. At this point the track divides into two branches, one branch traversing north along J street and the other east along Stanislaus street. Certain of the cars—called the North Park cars—leaving the depot run out J street, and others go out as far as the intersection of J and Stanislaus streets, thence east out the latter street. The last mentioned are

called and known as the Blackstone avenue cars.    It is thus
to be observed that a resident of Stanislaus street, by taking
a Blackstone avenue car at the depot, would be carried out
Stanislaus street without changing cars; but if such resident
should take a North Park car it would be necessary for him
to transfer to the Blackstone car at the junction of J and
Stanislaus streets, and receive a ticket or transfer for that
purpose from the car upon which he started from the depot.

The facts, as we glean them from the testimony of the plain-
tiff, show that at about 11 o'clock on the night of July 5,
1904, said plaintiff, then about eighty years of age, returning
home from San Francisco, reached the city of Fresno by way
of the Southern Pacific Railroad on what is known as the
"Owl" train.    At that time he resided on Stanislaus street
in said city of Fresno.    On alighting from the train he saw
one of the cars of the defendant standing near the depot and,
accosting the motorman, inquired whether said car was a
Blackstone avenue car, to which question the motorman made
an affirmative answer, and he thereupon took a seat on said
car.    The plaintiff, so he testified, was under the belief, from
what the motorman had said, that he would not be compelled
to change cars in order to reach his home, and remained under
that impression until said car had reached the intersection of
J and Stanislaus streets, when, from the direction in which
the car was proceeding, he learned for the first time that he
was on a North Park car and that it would, therefore, be
necessary for him to transfer to another or the Blackstone
car.    Plaintiff testified that, immediately upon learning that
he must change to the Blackstone car, he looked for the con-
ductor for the purpose of securing a "transfer," but could
not see him, and, the Blackstone car being about ready to
start, he at once boarded it, taking an outside front seat on
the right-hand side near the motorman.    He further declared
that as soon as he took his seat on the Stanislaus car, he in-
formed the motorman of the fact that he had come up from
the Southern Pacific depot on the North Park car and had
failed to secure a transfer because he was unable to find the
conductor on that car, and requested the motorman to let
him off at L street.    The motorman replied that he would
have to see the conductor "about that."    What occurred
thereafter may best be told by the plaintiff himself, from
whose testimony we therefore quote:

"The car started immediately after I got on it, and it was soon after I spoke to the motorman and he told me to see the conductor. I kept my eye back there to see when the conductor would come up. The conductor at the time was on the rear part of the car, he had not come up in front, but about the time we crossed K street, that was a block from the junction where we started, the conductor came out and asked me for my fare, and then I told him that I had come up on the car from the depot and had missed getting a transfer when I got off. I told him I had looked about when I got off and didn't see the conductor on the car that I came up on. I told him up to that time I supposed I was on the Blackstone car and would not have to have a transfer, but when I found I needed a transfer I couldn't see the conductor any more to get one and so I got on the car without a transfer. When I told him I wanted to get off at L street, to let me off at L street, he said I would have to pay another nickel. He said it in a very rough, brusk, abrupt sort of manner, like he was trying to make himself as disagreeable as possible. It riled me a little and I told him I would not. L street was the next street. Along when we were about half way from K to L and I told him I would not pay another nickel, he seized my arm, or my wrist. I was looking toward the rear of the car where he was, and he grabbed me by this arm in a very rough sort of way. My arm was out toward where he was, and he took a firm, hard hold of my wrist, and I told him to let go and made an effort to pull my hand away from him, and I found it was very difficult to do that. In fact, I didn't succeed in doing it, he held on to it hard and fast. After making one vigorous effort to get my hand away, I raised up on my feet and turned my face over toward him, my back to the outside of the car. I had a small hand-bag in my other hand, just a small traveling-bag, and then the last I remember I was trying to wrench my hand away from him and don't know anything more until I tried to get off the ground. When I came to myself on the ground I attempted to get up on my feet. . . . Up to that time the car hadn't stopped at all. It was going at full speed, so it seemed to me, and up to that time I hadn't made any effort to get off at all. I had no idea of making an effort to get off until the car stopped anyway. I had no overcoat, just that little satchel. When the conductor demanded a nickel of me I told him to

let me off at L street and he was then within half a block of
L street.''

''Q. Now, about what part of the street did you land, Mr.
Braly?''

''My satchel and hat were lying pretty near to the east side
of L street; it was within a very short distance of the east
side of L street. When I came to myself, the best I remem-
ber I was three or four steps farther toward the middle of the
street, toward the west side of the street, but I had been on
my feet. It seemed to me I had struggled to my feet after
the difficulty, and had made three or four steps toward the
middle of the street. At least that is what I thought when I got
up. I couldn't remember distinctly, but that is what it
seemed to me I had been doing. Anyway, I know I was some
three or four steps from where my hat and satchel were.
Up to that time there had been no signal given to the motor-
man to stop the car at L street; nothing that I know of at all.
I was right there at the motorman and the car seemed to me
to be keeping right up at full speed, so long as I remembered.''

On cross-examination the plaintiff further testified: ''I have
been noticeably and considerably hard of hearing for a great
many years, twenty or more, I guess. . . . For twenty years
past I have had to be spoken to very much as you are speak-
ing to me now, in a distinct tone of voice. It is not so much
the loudness of a man's voice as the distinctness and the
carrying tone of his voice. I was trying all the time to wrench
my hand away from the conductor. I know there was just
that much of a scuffle. I know I tried repeatedly to get my
hand loose from him, four or five times that I tried to wrench
my hand away from him. He seemed to be trying to detain
me. I couldn't see anything else he was trying to hold me for
except to collect that nickel. At any rate, I didn't want him
holding me. He had no right to hold my arm and I didn't
argue with him about letting go, but I wanted him to let my
arm go. . . . I wasn't making an effort to get off, was not
making any preparations to get off. I had told the motorman
to stop and I was all ready to get off if he stopped the car.
. . . The car was going full speed and I didn't propose to
get off while it was going that way, didn't expect to, didn't
want to. I was ready to get off if he had let my arm alone.
That was the only preparation I had to make to get off. . . .
After he got hold of my arm I tried to wrench it away **from**

him, and he didn't let go. He was a little stronger than I was. Then I raised from my seat and got to wrenching my arm away from him, but he held on there very tight, and the next thing I knew after that I was getting up off the street, or was trying to. How I went off the car I can't tell you, but it was in the struggle with him. He had a firm, hard grip on my arm. . . . I was quite close to the conductor during the time I had that conversation with him and I think I heard everything he said to me. . . . In trying to wrench myself loose from him I went overboard, and just exactly how, I don't know.''

The evidence introduced on behalf of plaintiff disclosing the important circumstances under which he sustained the injuries from which this action has arisen consists entirely of the testimony of the respondent himself, and the foregoing represents a fair resume of the facts as they were detailed at the trial by him.

As to the nature and extent of the injuries received by the plaintiff, Dr. Hayden, who was immediately called in, testified: ''I found him at his residence in bed. He had quite an abrasion, contusion on the left side of the forehead, and on examination I found the left shoulder broken, and he was considerably, somewhat dazed, if I remember right, and suffering a great deal of pain with his broken shoulder.'' After describing, in technical terms, the character of the injury to the shoulder, the doctor resumed: ''I have examined Mr. Braly since for the purpose of ascertaining the extent of the injuries, and their permanency. There never will be an entire recovery, in my judgment, because with that kind of injury it is almost impossible to get a complete apposition of the parts and retain them there. . . . When it comes to raising the arm, like this, by the use of the large deltoid, this large muscular plane that comes over the joint has shrunken very largely, and he is unable to raise his arm this way, but he can swing the arm back and forth this way. There is a permanent injury to that arm and its use in some of its motions and he will never obtain the full and entire use of his arm again, in my judgment. . . . During the time I was attending him he suffered considerably and his injuries were very painful.''

Mrs. Braly, wife of the plaintiff, testified that he suffered so much pain from his injured shoulder for about a year that

he was unable to obtain during that time "a comfortable night's sleep."

The testimony offered by the defense differs materially from that given by the plaintiff concerning the circumstances leading to the injuries sustained by the latter. The conductor and the motorman testified that the plaintiff, after having been asked for his fare, refused to pay the same, and shortly thereafter arose from his seat and placed one foot on one of the steps of the car while it was in motion as if he intended stepping off. The conductor said that he admonished the plaintiff not to undertake to get off the car until it was stopped, and, being apprehensive that plaintiff would not heed the warning thus given, or that he might fall from the car, he placed his hand on plaintiff's arm and clutched the clothing, so as to prevent him from either falling or trying to step off. The conductor denied that he caught hold of plaintiff's wrist in a violent manner or at all, or that he placed his hand upon him until, as before stated, plaintiff placed his foot on the step. In fact, the testimony of the conductor was, in substance, that no violent scuffle between them occurred, and that plaintiff's precipitation to the ground was due to his own carelessness.

The motorman testified on cross-examination that the car was going at the usual speed until he reached L street, when, thinking plaintiff intended trying to get off, he put on the brakes so as to "slow down"; but that the conductor had given him no signal to stop. He further testified that he heard the conductor ask Braly, "Don't you think you ought to pay your fare?" that thereupon the plaintiff arose from his seat, at the same time saying that the conductor was trying to rob him and that he would not be "buncoed" that way; "I did not see the conductor put his hand on Mr. Braly," continued the motorman, "until he got on the first step of the car. Then he reached out with his fingers and thumb. That did not have any effect on Mr. Braly to stop him or hold him, he went right on. In my position as motorman running that car, my face would be turned in the opposite direction from where these people were and my duties there required my constant watching and attention. . . . Mr. Braly was about three feet behind me, and when he was talking to the conductor he had his back toward me. When he raised to get off the car, the conductor took hold of him somewhere."

Other witnesses, who were passengers on the car, testified that they heard or saw no violent trouble between the conductor and plaintiff prior to the accident. Two witnesses besides the conductor and motorman testified that they heard some one say "not to get off till the car stopped." All the passengers, except one, that were called as witnesses for the defense, were either on the inside of the car or on the outside seats on the rear end of the car. But the witness Loper was riding on the "left-hand front end, open part, of the car," at the time, and he testified that "as we approached L street, and just before the car stopped, I heard some one behind me say, 'Don't get off until the car stops.'" Further he testified: "Previous to or at the time I heard those words 'don't get off till the car stops' I did not hear any scuffling or particular noise, excitement of that kind."

The foregoing is in substance the testimony received on behalf of the defendant.

Counsel for the appellant, while recognizing the rule in this state, established by the constitution, that the appellate courts are restricted in their appellate jurisdiction to the review and consideration of questions of law alone, urge, as among other reasons which they contend must compel a reversal of the judgment and order, that the evidence is insufficient to justify the verdict returned by the jury.

In support of this position, it is argued with much earnestness and learning that the story as related by the plaintiff is, upon its face, intrinsically improbable, and that it is so obviously so that we are required to declare that his case, resting as it does, almost entirely upon his own testimony, must fall, because it is thus clearly manifest, and therefore it must be said, that the evidence, as a matter of law, is totally insufficient to justify the verdict upon which the judgment is founded.

We have, in view of this argument, examined the testimony of the plaintiff, in connection and comparison with the other testimony presented by the record, with unusual and critical care, and are not thus led to an assent to the learned counsel's criticism thereof.

Cases may arise (and no doubt have arisen) in which the testimony directed to the support of the fact in dispute may bear upon its face the indubitable earmarks of falsehood—as, for instance, the facts thus brought out might themselves,

upon their face, disclose that it was physically impossible that they, as stated, could have existed or occurred at all. But this is not such a case.

The argument is that, as none of the witnesses—passengers on the car at the time—other than the plaintiff himself, saw or heard the trouble between the conductor and the former as it was described by the plaintiff, and as it appears improbable that the apparently extended colloquy which the plaintiff testified took place between himself and the conductor could have so taken place in the short distance traversed by the car, going at the usual speed, from the time the trouble began until plaintiff fell to the ground, that therefore the story, upon its face, is so impressed with the characteristics of improbability that it is inherently unbelievable. It is, of course, impossible for this court to explain why the other passengers on the car would not have been attracted to and observed the trouble between the plaintiff and the conductor, if it was as violent and demonstrative as it was described by plaintiff to be, for he testified that the conductor roughly caught hold of his wrist and that a struggle or scuffle, due to his efforts to extricate himself from the grasp of the conductor, ensued, and that many loud and acrimonious words passed between them during the altercation. But, as has often been declared by the appellate courts, such questions are matters which must be addressed entirely to the jury for solution—matters exclusively within the province of the triers of the facts to determine. The many tests afforded by the law which a jury may employ in determining the weight to which the testimony of witnesses may be entitled, are essentially beyond the power of appellate courts to invoke. Among the most important of these tests is the manner of a witness in relating his story, for his manner may, of itself, be sufficient, in the judgment of a jury, to justify the rejection *in toto* of an otherwise apparently truthful narrative. Or, take, for example, the case of the plaintiff here. His manner or style of testifying might have involved unnecessary prolixity or circumlocution (as is often the fact for various reasons, in witnesses unaccustomed to giving evidence in courts), so that, from his testimony, as reproduced on paper, or even as given in court, it might appear that much more occurred in the way of conversation or colloquy between himself and the conductor than could possibly have taken place in the time within which the

same must necessarily have occurred. We do not know, and, in the very nature of things we cannot know, the manner in which the plaintiff told his story. The jurors could of course observe his manner, and it was their duty, which presumptively they performed, to consider the same in weighing his testimony. A witness' memory may appear to the jurors, by the manner in which he testifies, to be faulty, and yet such fact would not, and could not, be made to appear so to a reviewing court, because his manner, when testifying, cannot be displayed by the record on appeal. These propositions are commonplaces in the law governing the determination of the weight to be given evidence in courts of justice, but their restatement here, in connection with the point we are discussing, is only for the purpose of again illustrating, if illustration of so obvious a proposition be necessary, how barren of just and efficacious results in the administration of justice would be the practice of appellate courts, if such practice were tolerated, of passing upon questions of fact, presented "second-hand," so to speak, or where the facts were not directly from the lips of the witnesses in their presence. The case here is one in which there arises a substantial conflict in the evidence, and, while it would appear incredible that the passengers that testified did not hear and see the altercation resulting in plaintiff's injuries as the latter described it, if it happened that way, the verdict is a finding that the jurors reconciled all discrepancies and variances and seeming improbabilities arising in the evidence, whatever they were, to their satisfaction, and to this finding this court must submit. It is a significant fact, it may be suggested in this connection, that it was nearly two years from the time the injuries were received by plaintiff to the time of the trial, and it is not at all improbable that the manner in which some of the witnesses gave their testimony convinced the jury that their recollection of the facts as they occurred was somewhat vague, dubious and uncertain. It is only natural that disinterested witnesses would not retain in their minds for so long a period all the details of a transaction such as the one from which this action originated. In addition to the foregoing observations, involving, as perhaps they do, speculation as to how the jury could, from the evidence, have reasonably reasoned out its verdict, it is to be noticed that there are two circumstances, admitted by the defendant's main witnesses, which would ap-

pear to be corroborative to some extent of plaintiff's version
of the difficulty.    These are, that the conductor did lay his
hands on the plaintiff during the altercation, although they
said not violently, and that from the beginning of the trouble
to the time the plaintiff fell from the car, no signal was given
the motorman by the conductor to stop the car.    It is also a
significant admission. in some degree corroborative of plain-
tiff's story, that the last named said to the conductor that he
(plaintiff) did not propose to be "buncoed."

The plaintiff, although a very old man, was nevertheless an
active man, physically, and, from the testimony, appears to
have been in full possession of his intellectual faculties.    He
was, up to the time of the accident, engaged as a representa-
tive of a banking institution, acting in the capacity of land
surveyor, the duties of which were to examine and appraise
the value of lands on which the bank had been requested to
make loans.

The facts, as found by the jury, show that the conductor
violently grasped the plaintiff by the wrist and held fast
thereto until in some manner, not made clear, the latter fell to
the ground.    The car was going at full speed, and the plain-
tiff, as he had a right under the law to do, undertook to free
himself from the grip of the conductor.    No signal was given
by the conductor to stop the car, and, in the struggle, in some
way, not, as observed, clearly accounted for by the record,
the plaintiff was thrown to the ground while the car was yet
in motion.    That there was no intention on the part of the
conductor to stop the car is made to appear reasonably cer-
tain by the testimony of both the motorman and the con-
ductor, for they both declared that no signal had been given
to stop the car.    And, it may well be suggested, as a singu-
lar circumstance at least, of which the jury probably took
the same view, that if, as the conductor testified, the plain-
tiff was in the act of stepping off the car while it was still
in rapid motion, the former did not signal the motorman to
stop the car.    But we have already given a fair synopsis of
the facts as they were proved at the trial and found by the
jury, and it is unnecessary to further recapitulate them.    It
is enough to say that the jury was fully warranted in con-
cluding and finding that the difficulty on the car occurred as
the plaintiff described it; that the conductor attempted by
unwarranted means and violence to compel the plaintiff to

pay his fare, and that in the "scuffle" following the attack upon the plaintiff by the conductor, the former by some means either fell or was thrown to the ground. It may be added that no effort was made, except, of course, such as was attempted by means of the unaccepted testimony of the conductor, motorman and other witnesses for the defense purporting to give the circumstances of the trouble, to impeach the testimony of the plaintiff, and the jury having been persuaded, after full consideration of the whole case, of the truthfulness of his version of the transaction leading to his injury, and the facts as testified to by him having disclosed that his injury was received through the negligent act of the defendant or its agent, acting, when committing such act, within the scope of his authority as such, and through no fault of plaintiff himself, then, necessarily, no reason is made apparent by the record, so far as the evidence is concerned, upon which a disturbance by this court of the finding of the jury, and, consequently, the judgment, could be justified.

Counsel for appellant have presented and reviewed many cases from this and other jurisdictions expounding the principles applicable to cases of the character of the one here. The principles thus exploited are well settled and elementary.

No one has ever denied, or attempted to deny, that a person boarding a train or street-car must pay the required fare or suffer ejection therefrom; that upon a refusal to pay such fare the passenger may be removed from the train or car by the conductor, by the use of such force only as is reasonably necessary. All the cases cited by counsel go to this extent only, and, with the exception of three or four of the large number of cases thus brought to our attention, the injury alleged consisted entirely in the act of expulsion, and were not cases in which physical injuries were claimed to have been inflicted through the negligence of the defendants.

But it is said that "it is held by the authorities that to make a defendant liable it is necessary that the relation of carrier and passenger exist at the time of the assault or at the time of the commission of the acts by the defendant." (Citing *Reilly* v. *New York City Ry. Co.*, 46 Misc. Rep. 72, [91 N. Y. Supp. 319], and *Palmer* v. *Winston-Salem R. & E. Co.*, 131 N. C. 250, [42 S. E. 604].) As an abstract legal proposition, no one can question the soundness of the statement thus made; but it does not apply to this case. As we

understand the argument of counsel, the contention is that, as the plaintiff had refused to pay his fare, he cannot be treated in law as a passenger, and hence the relation of passenger and carrier did not exist between him and the defendant at the time the injuries were received. No case to which our attention has been directed has carried the doctrine to that extent, and we think no such case can be found. In the case of *Reilly* v. *New York City Ry. Co.,* 46 Misc. Rep. 72, [91 N. Y. Supp. 319], the passenger had voluntarily left the car at a station, after having trouble with the conductor on the car. The passenger awaited the conductor on his return trip. The conductor left his car and stepped into the office of the company to which the car belonged, and there the passenger renewed the quarrel and the conductor assaulted him. Obviously, the company could not be held liable for the assault, because the relation of passenger and carrier had ceased, and it was so held.

In *Palmer* v. *Winston-Salem Ry. & Electric Co.,* 131 N. C. 250, [42 S. E. 604], the passenger had reached his destination and dismounted from the car. He had engaged, while on the car, in a quarrel with the motorman, and after depositing his bundles on the sidewalk, returned to the car, renewed the altercation with the motorman, and then turned and left the car, whereupon the motorman followed him up and, two or three steps from the car, delivered a blow on the back of plaintiff's head with the lever which was used in controlling the car, knocking him down. It was held that the plaintiff could not recover from the company for the assault, inasmuch as the passage had terminated for the passenger, and that consequently the relation of passenger and carrier between the plaintiff and the defendant had ceased.

In the case at bar, while, having refused to pay his fare, the plaintiff thus became a trespasser, and was, therefore, subject to be removed from the car, he was, nevertheless, a passenger in so far as the nature of the treatment due him from the defendant and its agents was concerned. The conductor had a perfect right to eject him, but he had no right to assault or otherwise maltreat him merely because he was primarily in the wrong by the refusal to pay the required fare. In other words, there was no authority in the conductor to collect the fare by force or other unlawful means, nor to remove the plaintiff by means of any more force than

might be reasonably necessary to accomplish that fact. In this connection, the language of the late learned Judge Sanderson, speaking for our supreme court, in *Needham* v. *San Francisco & S. J. R. Co.*, 37 Cal. 419, the action being for damages for injuries to a horse inflicted through the alleged negligence of the defendant, is pertinent: "The Golden Rule is a cornerstone of the law as well as of morals, and in the department of the former finds its expression in the maxim: *Sic utere tuo, ut alienum non laedas.* No more in law than in morals can one wrong be justified or excused by another. A wrongdoer is not an outlaw, against whom every man may lift his hand. Neither his life, limbs, nor property are held at the mercy of his adversary. On the contrary, the latter is bound to conduct himself with reasonable care and prudence, notwithstanding the fault of the former; and if, by so doing, he can avoid injuring the person or property of the former, he is liable if he does not, if, by reason thereof, injury ensues."

The proposition will not be controverted that, if the conductor caught hold of the plaintiff in the manner described by the latter, and continued thus to hold him until the plaintiff either fell or was thrown to the ground, the act of the conductor involved an assault for which the defendant could be held liable, and if, as a result of such assault, and through no fault of his own, the plaintiff fell or was thrown to the ground from the car, while the same was in motion, receiving the injury for which he here asks damages, then the defendant is liable for damages for the injury so received. And it will not be disputed that, if the trouble originated and occurred as described by the plaintiff, the latter was justified in defending himself against the assault. We see nothing in plaintiff's testimony as it appears here from which the jury would have necessarily been justified in finding that he was guilty of contributory negligence, or, in other words, that any act of the plaintiff was the proximate cause of the injury received by him. Just how it happened that he fell from the car he did not know, and, as the jury evidently disbelieved and discarded the defendant's evidence, it must have concluded that, in his efforts to release himself from the clutch of the conductor, the plaintiff lost his balance and fell from the car—by no means an improbable theory under plaintiff's testimony. And, as we have seen, it must have been upon

the testimony of the plaintiff alone that the jury founded its verdict, for the testimony offered by the defendant, if believed, would have forced a verdict for the defendant.

This is a case, therefore, where the question of contributory negligence was one peculiarly for the jury to determine. Indeed, the question of contributory negligence is nearly always a matter for the jury, and the burden of proving it rests upon the defendant, unless the undisputed facts, shown by the plaintiff's own evidence, clearly disclose that the complaining party has not exercised such care as men of prudence usually exercise in positions of like exposure and danger, in which case it becomes a question of law for the court. (*Glasscock* v. *Central Pac. R. R. Co.*, 73 Cal. 137, [14 Pac. 518] ; *Franklin* v. *Southern Cal. M. R. Co.*, 85 Cal. 63, [24 Pac. 723] ; *Hodges* v. *Southern Pac. Co.*, 3 Cal. App. 310, [86 Pac. 620] ; *Dunnigan* v. *Peterson*, 3 Cal. App. 764, [87 Pac. 218] ; *Williams* v. *San Francisco & N. W. R. R. Co.*, 6 Cal. App. 715, [93 Pac. 122] ; *Herbert* v. *Southern Pac. Co.*, 121 Cal. 227, [53 Pac. 651] ; *Carr* v. *Eell River etc. R. R. Co.*, 98 Cal. 368, [33 Pac. 213] ; *Green* v. *Pacific Lumber Co.*, 130 Cal. 435, [62 Pac. 747].)

Even if it be true that it subsequently developed that plaintiff did not exercise the best judgment in the manner of resisting the assault of the conductor under the circumstances shown by the record, yet that fact of itself cannot and does not constitute negligence on his part. "A passenger," says the supreme court in *Lawrence* v. *Green*, 70 Cal. 421, [59 Am. Rep. 428, 11 Pac. 752], "ought not to be deemed guilty of contributory negligence when he takes such risk as *under the same circumstances* a prudent man would take. (Citing Shearman & Redfield on Negligence, sec. 282.) And, when the circumstances are such as would *deprive a person of ordinary prudence of his self-possession* (italics *here* ours), it is not to be expected that he will have all his mental faculties perfectly at his command." (See *Robinson* v. *Western Pac. R. R. Co.*, 48 Cal. 421; *Green* v. *Pacific Lumber Co.*, 130 Cal. 435, [62 Pac. 747] ; and *Dunnigan* v. *Peterson*, 3 Cal. App. 764, [87 Pac. 218].) In cases where a party is suddenly put in a position of peril by the negligent act of another, "without sufficient time to consider all the circumstances, he is excusable for omitting some precautions, or making an unwise choice, under this disturbing influence, although if

his mind had been clear, he ought to have done otherwise. This is especially true if the peril is caused by the defendant's fault, and of such case it is said: 'Even if, in bewilderment, he runs directly into the very danger which he fears, he is not in fault. The confusion of mind, caused by such negligence, is part of the injury inflicted by the negligent person.' " (*Schneider* v. *Market St. Ry. Co.*, 134 Cal. 490, [66 Pac. 734], citing and quoting Shearman & Redfield on Negligence, sec. 89.)

The plaintiff here, as seen, was a very old man, of intelligence, occupying a responsible position and laboring under the belief—a mistaken one, it is true—that, having paid his fare to the first conductor, he was entitled to be taken to his home without producing a transfer check by explaining to the conductor on the car to which he transferred the circumstances attending his omission to secure such check. He was, according to his story, which was accepted by the jury, pounced upon by the conductor in a violent and brutal manner, and roughly commanded to pay his fare. Is it to be wondered that in his indignation at such treatment he would become perturbed and confused? If, therefore, he acted injudiciously under the circumstances, upon whom should the responsibility of such want of discretion on his part be required to rest? The law answers that it must fall upon him by whose negligence such indiscreet conduct was caused.

In dismissing this question of alleged contributory negligence on the part of the plaintiff, we may assume, for the purposes of the argument, that he did not exercise the best judgment in his manner of resisting the assault of the conductor under the circumstances indicated, and, so assuming, may inquire—is there anything in the evidence produced by the plaintiff in support of the allegations of his complaint disclosing such negligence by him as to justify the taking of the q lestion of contributory negligence from the jury? If there is, it has not been pointed out, nor have we been able to find it.

The appellant complains that the court erred to his prejudice in refusing to read to the jury instructions Nos. 1, 2 and 3, requested by him, and in giving instruction No. 18 at the request of plaintiff. We think the law of the case was fully and fairly stated by the court in its charge to the jury. The principle declared in the rejected instruction, numbered

1, requested by defendant, was clearly covered by and declared in instruction No. 9, given by the court on the defendant's motion. Instruction No. 2 was properly rejected. The principle enunciated therein was covered by the given instructions, particularly by instruction No. 10. But the rejected instruction contained a statement not authorized by the evidence. There was not, as we have seen, any evidence that the "conductor in charge of the car operated by defendant on which plaintiff was riding when he was injured, *signaled* the motorman to stop such car."

Instruction No. 3 was also properly refused. It reads: "A passenger who fails to ask or obtain any written transfer or other evidence of his right to ride in a street-car which he enters after leaving one in which he has paid fare may be lawfully, rightfully and properly ejected if he refused to pay fare therein and the conductor is not obliged to take the passenger's statement as evidence of his right to ride." This instruction contains, manifestly, a correct statement of the law, and the rule as thus declared was in effect given in certain instructions read to the jury by the court. But the instruction is not altogether pertinent to the facts as established by the evidence, and for that reason alone the court was justified in refusing to submit it to the jury. The evidence does not show that the conductor attempted to eject or remove the plaintiff from the car. To the contrary, the testimony of both the conductor and the motorman was to the effect that the former was, during the altercation, attempting to restrain the plaintiff from leaving or stepping from the car. Again, the evidence is, we may suggest, at the expense of repetition, that no signal or other proper steps were taken by the conductor to stop the car so that he could "lawfully and rightfully" eject the plaintiff.

We are unable to perceive any tenable ground for the criticism to which instruction No. 18, given to the jury at the request of the plaintiff, is subjected by counsel for appellant. The instruction involves, we think, a fair statement of the theory of the plaintiff's case as developed by the proofs. But counsel particularly objects to the following portion of said instruction: " . . . that the plaintiff . . . before taking the car, inquired of one of the agents of the defendant, to wit, the motorman of said car, if that car would take him along

9 Cal. App.—28

:Stanislaus street, and was informed that it would; that in reliance upon said statement and information the plaintiff took said car as a passenger of the defendant, intending to stop at Stanislaus street at a point near his then residence." Counsel declare that there is no evidence that plaintiff inquired of the motorman of said car "if that car *would take him along Stanislaus street,* and was informed that it would." Strictly and literally speaking, counsel are right; but the jury could not have been misled by the instruction, in view of the evidence upon the point as to which the criticism is ventured.   Plaintiff testified that he asked the motorman if "that car was a Blackstone avenue car," to which the motorman gave an affirmative reply.   The evidence does show that the "Blackstone avenue car" traversed over Stanislaus street, and that said car would have taken him along that street.

We see no just reason for disturbing either the judgment or order, and they are, therefore, affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 21, 1909.